On the Merits.
In the protest presented to the committee, plaintiff alleges: That he and defendant were the only candidates for the nomination in question. That, on the face of the returns, he received 368, and defendant 372, votes; that the election was null, because of the following alleged illegalities at Jones’ precinct, in the Tenth ward, to wit: (1) That the poll was closed before 7 o’clock p. m.; (2) that W. L. Pugh was a commis *595 sioner of election, candidate for nomination as police juror, and friend of the defendant, and that he repeatedly went with voters into the booth and directed and assisted them in the preparation of their ballots, without their solicitation and contrary to their wishes, none of said voters requiring such assistance, and that he intimidated and otherwise influenced said voters to cast their ballots against petitioner; (3) that the count and returns from, said precinct “were illegal, null, and void,” no particulars being given in connection with that allegation.
[4] It appears from the evidence that the poll was closed about 5 o’clock, after all the registered voters had cast their ballots, save five, of whom four had left the state, and the fifth was sick in bed; that W. L. Pugh was a commissioner of the election, but, having received the nomination to membership ■of the police jury, without opposition, was not a candidate at said election; that at the request of a number of the voters he aided them in the selection of candidates on the state ticket, and one of the voters testifies that, at his request, Pugh gave him some information about one of the candidates for the office of sheriff. It is said that all the voters were summoned as witnesses, and, as & matter of fact, 26 of them were placed on the stand by plaintiff. Not one of them tes- . tified that Mr. Pugh made any suggestion to him, or to any other voter, save when requested; not one testified that he influenced ■or intimidated any voter; and not one testified that Pugh saw his ballot for parish •officers or knew how he intended to vote. There were 10 candidates for the parish officers, and defendant and one other received .all the (46) votes cast; plaintiff getting none. On the trial of the case, plaintiff interrogated the witnesses about many things that were not referred to, or suggested, in the protest filed by him before the committee, and the testimony thus sought to he elicited was objected to and excluded. The ruling was correct. The law makes it the duty of the chairman of the committee to cause the returns of such an election to he tabulated and compiled, as soon as they are received, and at 12 o’clock noon, on the fourth day after the election, the committee is required to convene and- promulgate the result. It further provides as follows:
“That any candidate, feeling aggrieved at the result of the said primary, shall, then and there, file his written protest, setting forth, in detail, clearly and distinctly, his grievances, and the committee shall, immediately, proceed to hear and determine same and proclaim the result of said primary; provided, however, that any candidate feeling aggrieved by the decision of the committee shall have the right to have the same reviewed by a court of competent jurisdiction; provided, further, that the committee, hearing and determining the said contest, shall have the authority to summon witnesses and compel their attendance, administer oaths and order the production of any books, papers, or documents that may be necessary, and do any act or thing that it may deem necessary to arrive at a correct decision of said protest or contest.”
[5] What plaintiff was entitled, to, under the law thus quoted, was a review of the decision of the committee, upon the case presented to it. What he sought to do, in the district court, was to ingraft on that case a new and different one, which the court was without jurisdiction to hear and decide. The same thing may be said of an attempt to have the committee reconvened, in order that it might consider another, or supplemental, protest. The law does not authorize it, and the chairman of the committee properly declined to entertain the application. There is absolutely nothing in the record before us to suggest even a suspicion that any voter cast his ballot otherwise than in accordance with the dictates of his judgment and, that being the case, there is no warrant in the law for setting the election aside.
[6] The statute governing primary elections is framed, as to the right of the voter to ask for assistance in the preparation of *597 his ballot, in language which, with evident purpose, differs materially from that used in the framing of the general election law; but, even if it were the same, the penalty .for a violation of the provisions on that ■subject is visited upon the parties to the ■offense, and not upon the body of the electorate, or public at large. In other words, •section 24 of Act 49 of 1906, as amended .and re-enacted hy Act 240 of 1910, provides that:
“The voter shall be at liberty, if he is unable to prepare his own ballot, to call upon one of the commissioners, or watchers, or clerks of ■election, to assist him.”
And for violation of that provision, the .guilty person is to be punished (under section 31 of Act 49 of 1906) by fine, imprisonment, and disfranchisement. But it is nowhere said that, as a further penalty, the ■election, otherwise legally conducted, and ■whereby a majority of the qualified voters have expressed their will, is to he set aside. The generally accepted doctrine applicable to the point thus presented is stated as follows:
“Where a Legislature declares a certain irregularity in election procedure to be fatal to the validity of the returns, the courts will effectuate that command. And the whole con■duct of election officers may, although actual fraud be not apparent, amount to such gross negligence and such a disregard of their official ■duties as to render their return unintelligible or unworthy of credence. But the power to throw out an entire division is one which ought to be exercised with the greatest care and only under circumstances which demonstrate beyond ¡all reasonable doubt that the disregard of the law has been so fundamental or so persistent and continuous that it is impossible to distinguish what votes are lawful and what are unlawful, or to arrive at any certain result whatever, or where the great body of voters have been prevented by violence, intimidation, and threats from exercising their franchise.” Cyc. vol. 15, p. 373.
See, also, Burton v. Hicks, 27 La. Ann. 514; Madere v. Sellers et al., 120 La. 812, 45 South. 735.
In the instant ease, the great body of the ■voters have been accounted for; that is to say, 26 of, say, 51, who were entitled to vote, and of 46, who voted, were called by plaintiff as witnesses,, and the consensus of their testimony is that the election was fairly conducted. And, as they all voted the same way, so far as the nomination to the clerkship is concerned, we must assume that the other 20 would have testified in the same way, if plaintiff had thought proper to put them on the startd.
Our conclusion is that there is no error in the judgment appealed from, which rejected plaintiff’s demands, and it is, accordingly, affirmed.